UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>IAN L. RENERT,<br>HAWTHORNE STERLING & CO. and<br>DONNA L. WOOD,<br><br>Defendants. | Case No. 3:01cv1027(PCD) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR ENTRY OF
## DEFAULT JUDGMENT AGAINST
## DEFENDANTS IAN L. RENERT AND HAWTHORNE STERLING & CO.

Plaintiff Securities and Exchange Commission ("Commission") submits this

memorandum in support of its motion, pursuant to Fed. R. Civ. P. 55(b), for entry of a default

judgment against defendants Ian L. Renert and Hawthorne Sterling & Co. ("Hawthorne").  In

further support of the motion, the Commission also submits the accompanying Declaration of

Frank C. Huntington, Esq.

## INTRODUCTION

This case involves the fraudulent offer and sale of unregistered securities in the form of

interests in a group of unregistered foreign investment companies known as the "Hawthorne

Sterling Family of Funds" ("the Funds").  Renert, then a resident of Connecticut, controlled all

aspects of the Funds' operations, including all investment decisions.  Hawthorne, a Delaware

corporation which Renert owned and operated from his home in Connecticut, was the investment manager for the Funds.

Renert and Hawthorne offered and sold interests in the Funds to the general public through offshore seminars targeted at U.S. residents, an Internet website, several sales agents, and private placement memoranda. Renert and Hawthorne presented the Funds, which were purportedly organized in the Bahamas, as a way for U.S. investors to avoid income taxes. As detailed below, Renert and Hawthorne made numerous material misrepresentations and omissions to investors about the Funds' use of their funds, the risks of the Funds' investments, the calculation of management fees, the Funds' performance, and various fund management, accounting and compliance issues. From June 1997 through April 1999, Renert and Hawthorne raised at least $22 million from at least 730 investors in the U.S. and 120 investors abroad.

The Complaint was filed on June 6, 2001.[1] Renert and Hawthorne filed their answer on September 10, 2001. The parties then engaged in discovery for more than eighteen months (including initial disclosures, the exchange of thousands of pages of documents, and seven depositions). Discovery closed on May 10, 2003. Counsel for Renert and Hawthorne moved to withdraw on July 30, 2003, claiming that their bills had not been paid. The same day, Renert filed a *pro se* appearance for himself, but no new appearance was filed for Hawthorne. The Court allowed the motion to withdraw on September 23, 2003. Renert then withdrew his answer on October 7, 2003, choosing to "stand mute" against the Commission's allegations. The Court entered a default against Renert and Hawthorne on October 17, 2003. Accordingly, the

---

[1] The same day, a consent judgment was entered against the third defendant, Donna L Wood, who had been the Funds' bookkeeper and administrator.

Commission now seeks entry of a default judgment against Renert and Hawthorne that would:
(i) permanently enjoin Renert and Hawthorne from future securities law violations, (ii) require
Renert and Hawthorne, jointly and severally, to pay disgorgement and pre-judgment interest in
the total amount of $820,823, and (iii) require Renert and Hawthorne each to pay a civil penalty
in an amount determined by the Court.

## STATEMENT OF FACTS

Because a default has been entered against Renert and Hawthorne, the Commission's
allegations of fact must be taken as true and its claims against them must be considered
established as a matter of law. Evanauskas v. Strumpf, 2001 WL 777477, *3 (D.Conn. June 27,
2001); Clee v. Remillard Building, Inc., 649 F.Supp. 11237, 1130 (D.Conn. 1986). Accordingly,
the Court must accept the following allegations as true:

### Background

At all relevant times, Renert resided in Wilton, Connecticut. He is the founder and
control person of Hawthorne. He is also the founder and control person of Equivest Premier
Holdings, Ltd. ("Equivest"), a Bahamian International Business Corporation ("IBC") that is
wholly-owned by a trust whose beneficiary is Renert's domestic partner. [Complaint, ¶11.]

Hawthorne is a Delaware corporation which, at all relevant times, had its principal place
of business at Renert's home in Wilton, Connecticut. Renert formed Hawthorne in 1996 as a
vehicle for financial consulting and publishing and is the company's sole stockholder. [Id., ¶12.]

3

### Formation of the Funds

In June 1997, Renert, acting through Hawthorne, began soliciting U.S. investors for the Arcadia Mutual Fund ("Arcadia Fund"), which he described as an offshore mutual fund organized in the Bahamas. No registration statement was filed or in effect for this offering, and no exemption from registration was available. The Arcadia Fund did not register with the Commission as a foreign investment company. [Complaint, ¶14.]

In mid-1998, Renert was advised that the Arcadia Fund should register with the Commission as an investment company because its securities were beneficially owned by more than 100 U.S. residents. In an apparent attempt to avoid the registration requirement, Renert created approximately thirty new mutual funds, each purportedly organized as an IBC in the Bahamas, and randomly assigned the Arcadia Fund's investors to the newly-created funds ("the Funds"), so that each would have fewer than 100 U.S. investors. No registration statement was ever filed or in effect for the shares of the Funds, and no exemption from registration was available. The Funds did not register with the Commission as foreign investment companies. [*Id.*, ¶15.]

Renert appointed Equivest, which he controlled, as investment manager for the Funds. Renert then caused Equivest to delegate its investment management duties to Hawthorne, which Renert also controlled, pursuant to a so-called "sub-fund manager" contract. [*Id.*, ¶16.]

Renert caused private placement memoranda to be prepared for each new fund and distributed to the existing Arcadia Fund investors and to potential investors. The private placement memoranda stated that each new fund would operate as a separate entity with different investment objectives. To create the appearance of distinct entities, Renert used fictional names,

4

including the names of his pet geese, to sign fund documents.  In reality, however, Renert treated

the Funds as a single investment company.  He caused Wood, the Funds' administrator, to

calculate the assets, gains and losses of the Funds as though they were a single entity, and to use

the consolidated results to calculate investor returns and Hawthorne's compensation.  He also

directed Wood to commingle investor deposits and fund assets in bank and brokerage accounts

when making investments.  He even told some investors that the creation of the funds

represented a name change only and not a substantive change to the terms or the management of

their investment.  [*Id.*, ¶17.]

### The Public Offering of Interests in the Fund

From June 1997 through April 1999, Renert and Hawthorne induced at least 730

investors in 49 states and 120 investors in 11 countries overseas to invest at least $22 million in

the Funds.  Investors sent their money by check to either Renert or Wood or by wire transfer to

various accounts in the name of the Funds.  Until Bahamian authorities placed the Funds in

receivership in June 2000, Renert was at all times in control of funds received from investors and

made all investment decisions on behalf of the Funds.  [Complaint, ¶18.]

Renert and Hawthorne solicited U.S. investors for the Funds in several ways.  For

example, beginning in June 1997, Renert conducted at least four offshore seminars at which he

made presentations to hundreds of potential investors using a prepared script.  The seminars were

sponsored by two U.S.-based marketing groups that attract potential investors through, among

other means, advertisements in U.S. newspapers.  Renert also conducted one-on-one meetings

with interested attendees where he discussed the Funds.  [*Id.*, ¶19.]

Beginning in at least September 1998, Renert and Hawthorne also solicited investors via an Internet website describing two "High Yielding Tax-Free Offshore Mutual Funds" within the Hawthorne Sterling Family of Funds. The website directed potential investors to contact Hawthorne at Renert's Connecticut address and phone number. [*Id.*, ¶20.]

In addition, Renert and Hawthorne used several sales agents, known as "fund sponsors", to market the Funds to potential investors in exchange for a percentage of the Funds' profits. The fund sponsors, most of whom reside in the U.S., induced at least 89 investors to invest approximately $3.2 million in the Funds. [*Id.*, ¶21.]

## Attempts to Avoid Application of the Federal Securities Laws

The engagement agreements which Renert and Hawthorne required investors to complete stated that the Funds were not being offered directly or indirectly to U.S. residents, but in fact Renert and Hawthorne made strong efforts to solicit U.S. residents. For example, Renert advised investors during his group presentations on how they could reduce their exposure to U.S. taxes, and he stated that the Funds were approved for U.S. investment programs such as IRA and Keogh accounts. The Hawthorne website repeated the statement about approval for IRA and Keogh accounts and also contained information about how U.S. citizens could arrange tax-free cash advances. In addition, Renert and Hawthorne communicated with investors by U.S. e-mail accounts, sent statements to investors at U.S. addresses, accepted funds drawn on U.S. bank accounts, and maintained an investor roster indicating that most of the investors resided in the U.S. [Complaint, ¶22.]

6

The engagement agreements typically required investors to affirm that they were "accredited" or "sophisticated" investors, but in fact the agreements did not define those terms, and Renert and Hawthorne did not restrict their offering of the Funds' securities to high net worth individuals who met the applicable requirements under the federal securities laws. [*Id.*, ¶23.]

## False and Misleading Statements to Investors

### 1.    The Use of Investor Funds and the Risks of the Funds' Investments

Renert's presentations to investors, the website, and the private placement memoranda all contained statements about how the Funds would use the money raised from investors. For example, at seminars held in Mexico, Aruba, the Bahamas, and Jamaica during 1997 and 1998, Renert followed a prepared script and told investors that the Funds would invest in "bank debentures", in "restricted securities" issued by U.S. companies prior to an initial public offering, and in a market-timing program involving shares in U.S. mutual funds -- all of which, Renert claimed, involved little risk. As set forth below, many of these statements were false and misleading. [Complaint, ¶24.]

At the investor seminars, Renert told investors that bank debentures were a profitable investment opportunity which involved guarantees from "global financing organizations", such as the World Bank and the International Monetary Fund, and which presented "minimal risk". In reality, however, Renert's description of bank debentures reveals that he was referring to so-called "prime bank" instruments, a species of investment fraud involving non-existent securities purportedly issued by so-called "prime banks". These statements about the Funds' investments

7

in bank debentures were false and misleading, because such "prime bank" instruments do not exist and thus the investors' assets were at severe risk of loss. Indeed, Renert tried to use Fund assets in three separate unsuccessful transactions involving purported bank debentures, causing the Funds to incur a substantial loss, including $500,000 on one transaction. The Funds' losses on bank debenture trading were not disclosed to investors. [*Id.*, ¶25.]

At the investor seminars, Renert told investors that the purchase of restricted securities would allow the Funds to have their profits "locked in" and "not affected by the wild gyrations in the stock market." These statements about the Funds' investments in restricted securities were false and misleading, because Renert invested primarily in the volatile and illiquid securities of start-up and micro-cap companies, and such investments were in fact highly risky. [*Id.*, ¶26.]

In addition, Renert and Hawthorne failed to disclose that Renert was also using investor funds to engage in risky day-trading of securities. From at least November 1998 through February 1999, Renert traded heavily on margin in Internet stocks such as Yahoo, Inc. and Amazon.com, Inc. In all, Renert's day-trading activities caused a net loss of at least $2.2 million in Fund assets. [*Id.*, ¶27.]

Similarly, Renert and Hawthorne failed to disclose that in early 1998, Renert caused the Funds to lend him $365,000 at 4% interest which he used to purchase a second home in Florida. Even worse, Renert later caused the Funds to forgive this personal debt. [*Id.*, ¶28.]

2.     **The Funds' Performance**

Renert and Hawthorne told investors that the Funds should yield returns ranging from 80% to 160% per year by investing in bank debentures and restricted securities. Renert had no

basis for those statements because, as discussed above, the bank debentures were actually non-existent "prime bank" instruments and the Funds' risky investments in restricted securities were highly unlikely to generate such returns. [Complaint, ¶29.]

Not surprisingly, when Renert was unable to produce the extraordinary returns which he had promised, he misrepresented the Funds' performance in his communications with investors. For example, he posted on the Hawthorne website a "Fund Manager" statement dated December 6, 1999 stating that one of the Funds' investment programs was currently earning a return of 80% to 100% per year. In reality, however, the Funds' books and records were in such disarray that the performance of the Funds at that time was unknown. He posted a similar message dated December 14, 1999 stating that the Funds' accounting firm had valued the Funds' assets as of September 30, 1999 at approximately $18.5 million. In reality, however, the accounting firm had performed no such valuation. [*Id.*, ¶30.]

### 3. **Performance Fees**

The private placement memoranda for the Funds stated that the investment manager would earn a performance fee of 35% of all realized and unrealized gains and losses on securities and all dividend and interest income *after* deducting expenses. These statements were false and misleading, because Renert and Hawthorne actually caused the Funds to calculate and pay the fee based on the Funds' profits *before* deducting expenses. [Complaint, ¶31.]

In addition, the private placement memoranda did not disclose that the individual who conducted the timing program in mutual fund shares for the Funds would receive his own

management fee. In fact, from late 1998 through April 2000, that individual was paid approximately $346,000. [*Id.*, ¶32.]

### 4.    Fund Management, Accounting and Compliance Issues

Renert's presentations to investors, the Hawthorne website, and the private placement memoranda contained many false and misleading statements about fund management, accounting and compliance issues. [Complaint, ¶33.]

For example, the Hawthorne website stated that the Funds' administrator would be a CPA with experience administering mutual funds. In reality, however, Renert, who controlled all aspects of the Funds' operations, had no prior experience managing investor funds, and Wood, who handled day-to-day administration of the Funds from September 1997 until July 1999, had no experience administering mutual funds and was no longer licensed as a CPA during the relevant period. [*Id.*, ¶34.]

The private placement memoranda tated that the Funds would issue share certificates to investors and would maintain appropriate books and records. In reality, however, the Funds never issued share certificates, and their books and records were in complete disarray. [*Id.*, ¶35.]

The private placement memoranda also stated that the Funds' administrator would compute and publish the Funds' net asset value ("NAV") at the end of each quarter, that the NAV would be used to process requests for redemptions, and that investors would receive annual audited financial statements as well as quarterly reports concerning the results of operations and the NAV. In reality, however, the Funds' administrator never even calculated the NAV, and the

Funds never obtained audited financial statements and never provided quarterly reports. [*Id.*, ¶36.]

The private placement memoranda also stated that the memoranda were filed with the Bahamas Securities Commission and that the Funds were regulated in accordance with the Bahamian Mutual Funds Act of 1995.  In reality, however, the memoranda were not filed with the Bahamian authorities, and none of the Funds ever obtained a license to operate as a regulated Bahamian mutual fund.  [*Id.*, ¶37.]

## ARGUMENT

### I.  Renert and Hawthorne Violated the Federal Securities Laws

#### A.  Sections 5(a) and 5(c) of the Securities Act

Section 5(a) of the Securities Act of 1933 ("Securities Act") provides that, unless a registration statement is in effect, it shall be unlawful for any person, directly or indirectly, to sell securities through the use of any means or instruments of interstate commerce.  Section 5(c) provides for a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed.  *See* 15 U.S.C. §§77e(a), (c).  Once the Commission establishes a prima facie violation, the defendant has the burden of proving that the securities offered qualified for a registration exemption.

Section 2(1) of the Securities Act and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act") define "securities" to include "investment contracts".  *See* 15 U.S.C. §77b(1); 15 U.S.C. §78c(a)(10). An "investment contract" is defined as any "contract transaction or scheme" involving the investment of money in a common enterprise with an expectation of

11

profit solely from the efforts of others. *See* <u>SEC v. W. J. Howey</u>, 328 U.S. 293, 298-99 (1946);

<u>Revak v. SEC Realty Corp.</u>, 18 F.3d 81 (2nd Cir. 1994). Interests in the Funds satisfy all three

elements of this definition. First, the Funds involved an investment of money. Second, the

Funds involved a common enterprise, both horizontally (because Renert and Hawthorne pooled

investor funds) and vertically (because Renert's and Hawthorne's profits were directly tied to the

profits of the Funds). Third, the investors' profits were derived from the efforts of others – *i.e.*,

Renert.

The interests in the Funds thus constituted securities, and no exemption from registration

applied. For example, the offering did not qualify as an exempt private offering under Section

4(2) of the Securities Act or Rule 506 of Regulation D, because it was made by means of a

general solicitation to a potentially unlimited number of offerees through the Internet, offshore

seminars, and the promotional efforts of Renert's sales agents. *See* <u>SEC v. Murphy</u>, 626 F.2d

633, 644 (9th Cir. 1980); <u>Doran v. Petroleum Mgt. Corp.</u>, 545 F.2d 893, 899 (5th Cir. 1977).[2]

Similarly, the offering was not eligible for the safe harbor in Rules 504 or 505 of

Regulation D, because those exemptions limit the amount that may be raised during a twelve

month period to $1 million and $5 million, respectively, and are not available to issuers which

are investment companies. Likewise, the offering was not exempt from registration under

Section 3(a)(11) of the Securities Act, because that exemption is available only if the issuer

limits the offers and sales of the security to the state where it is incorporated and carries out a

---

[2] Rule 506 does not apply for the additional reason that it allows no more than 35 non-accredited purchasers in the offering and it requires issuers to provide certain financial and non-financial information to non-accredited investors prior to the sale. As discussed above, Renert and Hawthorne did not restrict the offering to a maximum of 35 non-accredited investors and did not provide the required information prior to sales

significant amount of its business. Here, the offering was conducted by investment companies, raised more than $22 million, and was not limited to Delaware (where Hawthorne was incorporated) or Connecticut (where Renert maintained his principal residence).

Finally, the exemptions under Regulation S were not available, because Regulation S does not apply to investment companies that must be registered under the Investment Company Act. *See* Preliminary Note 8 to Regulation S. Here, as discussed below, the Funds were required to be registered under the Investment Company Act.[3]

### B.    Section 7(d) of the Investment Company Act

Because the Funds held themselves out as being primarily in the business of investing, reinvesting and trading in securities, they were "investment companies" within the meaning of Section 3(a)(1) of the Investment Company Act of 1940 ("Investment Company Act"). *See* 15 U.S.C. §80a-3(a)(1). Because they sold the Funds' securities in connection with a distribution, Renert and Hawthorne acted as "underwriters" within the meaning of Section 2(a)(40) of the Investment Company Act. *See* 15 U.S.C. §80a-2(a)(40). Because the Funds were organized under the laws of a foreign jurisdiction, Renert and Hawthorne as underwriters of the Funds were prohibited by Section 7(d) of the Investment Company Act from using the U.S. mails or other means of interstate commerce to offer or sell interests in the Funds unless the Commission had

---

[3] The exemption under Rule 901 of Regulation S was not available for the additional reason that Renert and Hawthorne conducted "directed selling efforts" in the United States. *See* <u>SEC v. Banner Fund International, Inc.</u>, 211 F.3d 602, 610 (D.C. Cir. 2000) (Section 5 applies to offers and sales, which, although occurring outside the United States, "tend to have the effect of creating a market for unregistered securities in the United States").

13

issued an order permitting the Funds to register pursuant to Section 8 of the same statute or unless an exemption from registration was applicable. *See* 15 U.S.C. §§80a-7(d), 80a-8.

Neither of the two potential exemptions from registration was available. First, Section 3(c)(1) and Section 7(d) of the Investment Company Act exempt offerings of foreign investment companies that result in less than 100 beneficial holders. *See* Securities Act Release No. 6862, 1990 SEC LEXIS 740 (April 23, 1990); Touche Remnant & Co. SEC No-Action Letter (pub. avail. Aug. 27, 1984). Renert's purported break-up of the Arcadia fund into smaller funds does not qualify for this exception, however, because he treated the smaller funds as a single integrated entity. *See* Securities Act Release No. 4552, 1962 WL 3573 (Nov, 6, 1962); Prescott, Ball & Turben SEC No-Action Letter (pub. avail. Feb 17, 1979).

Second, Section 3(c)(7) of the Investment Company Act excludes from the definition of investment company an issuer whose securities are owned exclusively by "qualified purchasers," but only if the issuer is not making, or does not propose to make, a public offering of its securities. Section 2(a)(51) of the Investment Company Act defines "qualified purchaser" to include: (i) individuals and certain family companies that have not less than $5 million in investments, and (ii) certain trusts if the trustee and all settlors or other contributors are qualified purchasers. Further, the issuer must "reasonably believe" that the prospective investor is a qualified purchaser. *See* 17 C.F.R. §270.a51-1(h). The Section 3(c)(7) exclusion was not available to the Funds because, as discussed above, the Funds made a public offering, many of the investors were not "qualified purchasers," and Renert and the Funds could not reasonably have believed that the investors were "qualified purchasers."

14

## C.    Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act

Section 17(a) of the Securities Act prohibits materially false and misleading statements or omissions in the offer and sale of securities.  Similarly, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit false and misleading statements or omissions in connection with the purchase and sale of securities.  To establish violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must prove scienter, which is defined as a mental state embracing intent to deceive, manipulate or defraud.[4]  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 2 (1976); Aaron v. SEC, 446 U.S. 680 (1980).  Statements and omissions are material if a reasonable investor would consider them important in the total mix of information available.  Basic v. Levinson, 485 U.S. 224, 231-232 (1988).  To satisfy the "in connection with" requirement, a fraud need only "touch" upon the purchase or sale of securities.  See Sup't of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 12-13 (1971).

As shown above, Renert and Hawthorne made numerous material misrepresentations and omissions to investors in the Funds.  For example, they told investors that the Funds would invest in "bank debentures", but in fact such investments were non-existent "prime bank" investments.  They told investors that an investment in the Funds was "low risk" or "medium risk" and immune from market volatility, but in fact Renert purchased numerous securities issued by start-up and micro-cap companies, thereby causing investors to incur the risk that the issuers might become bankrupt or default on their obligations.  At the same time, they failed to tell investors that Renert used investor funds to engage in risky and unsuccessful day trading and to

---

[4] Scienter is not required to establish violations of Section 17(a)(2) and 17(a)(3) of the Securities Act, and so negligent conduct is sufficient.  See Aaron v. SEC, 446 U.S. 680, 697 (1980).

obtain a below-market rate mortgage for his personal residence. They told investors that an investment in the Funds would produce returns as high as 200%, but in fact the Funds' returns were much lower. They told investors that the Funds would pay a performance fee equal to 35% of *net* profits, but in fact the Funds paid performance fees equal to 35% of *gross* profits. They also told investors that the Funds would keep accurate books and records, would calculate NAV quarterly, and would comply with Bahamian law, but in fact none of those statements was true.

### D.    Sections 206(1) and 206(2) of the Advisers Act

Section 202(a)(11) of the Investment Advisers Act of 1940 ("Advisers Act") defines an "investment adviser" as any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. *See* 15 U.S.C. §80b-2(a)(11). Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser to engage in conduct which operates as a fraud or deceit on any client or prospective client.

Here, Hawthorne was an investment adviser to the Funds because it received a fee from them in exchange for selecting their investments. Through the fraudulent conduct identified above, Hawthorne violated Sections 206(1) and 206(2) of the Advisers Act because it made material misrepresentations and omissions to its advisory clients.

To establish aiding and abetting liability, the Commission must show: (i) a primary securities law violation by another party; (ii) awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper; and (iii) knowing and substantial assistance by the aider and abettor to the primary violation. *See* Cleary v. Perfectune,

Inc., 700 F.2d 774 (1st Cir. 1983); Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004,

1009 (11th Cir. 1985).  The knowledge or awareness element can be satisfied by recklessness

when the alleged aider and abettor is a fiduciary or active participant.  See ITT v. Cornfeld, 619

F.2d 909, 923-925 (2nd Cir. 1980); Ross v. Bolton, 904 F.2d 819, 824 (2nd Cir. 1990).

Here, Renert was the control person of Hawthorne, and he knew or was reckless in not

knowing that he was directing Hawthorne to pursue an illegal course of conduct.  Accordingly,

he is liable for aiding and abetting Hawthorne's violations of Sections 206(1) and (2).

## II.    A Final Judgment Should Enter against Renert and Hawthorne for a Permanent Injunction, Disgorgement, and Civil Penalties

### A.    Permanent Injunction

Section 20(b) of the Securities Act, Section 21(d)(1) of the Exchange Act, and Section

209(d) of the Advisers Act provide that the Commission may seek a permanent injunction

against further violations of the federal securities laws.  See 15 U.S.C. §77t(b); 15 U.S.C.

§78u(d)(2); 15 U.S.C. §80b-9(d).  A court will issue a permanent injunction if the defendant's

conduct indicates that there is a reasonable likelihood of further violations.  SEC v. Cavanagh,

155 F.3d 129, 135 (2nd Cir. 1998); SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994).  When

assessing the likelihood of recurrence, courts have considered, among other things, the nature of

the defendant's conduct and the degree of scienter.  SEC v. Cavanagh, 155 F.3d at 135; SEC v.

Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982).

Here, the need for injunctive relief against Renert and Hawthorne is compelling.

Motivated by the prospect of financial gain, they raised more than $22 million from more than

700 investors through the fraudulent offering of unregistered securities.  Renert has apparently

17

left the United States for South Africa, where he is reportedly raising funds for a new investment scheme. [Huntington Decl., ¶3.] Absent an injunction, nothing would prevent Renert and Hawthorne from trying once again to raise funds from U.S. investors by using material misrepresentations or omissions.

**B.    Disgorgement**

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." SEC v. First City Financial Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). It has long been recognized that the "deterrent effect of SEC enforcement actions would be greatly undermined if securities law violators were not required to disgorge illicit profits." SEC v. Manor Nursing, 458 F.2d 1082, 1104 (2nd Cir. 1972). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." SEC v. First City, 890 F.2d at 1231-32.

Here, the basis for an order of disgorgement is apparent. Renert raised more than $22 million from hundreds of investors and, as of June 30, 1999, had diverted at least $717,276 to himself and/or Hawthorne (which he controlled). [Huntington Decl., ¶4.]   Accordingly, the amount of Renert and Hawthorne's ill-gotten gain is at least $717,276, and they should be ordered, jointly and severally, to disgorge that amount, plus pre-judgment interest.

The Commission's standard practice is to seek pre-judgment interest on a defendant's disgorgement obligation calculated in the same manner that the Internal Revenue Service uses to calculate tax over-payments or under-payments. Applying that method, the pre-judgment interest on Renert and Hawthorne's disgorgement obligation of $717,276, calculated from the filing of

18

the Complaint on June 6, 2001 through September 30, 2003, would be $103,547, for a total

disgorgement obligation of $820,823. [Huntington Decl., ¶5.]

### C.     Renert and Hawthorne Should Be Ordered to Pay a Civil Penalty

Section 20(d)(2) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section

209(e) of the Advisers Act authorize a court to impose a civil monetary penalty for certain

violations of the federal securities laws. *See* 15 U.S.C. §77t(d)(2); 15 U.S.C. §78u(d)(3); 15

U.S.C. §80b-9(3).  By enacting these penalty provisions, "Congress sought to achieve the dual

goals of punishment of the individual violator and deterrence of future violations." SEC v.

Moran, 944 F.Supp. 286, 294 (S.D.N.Y. 1996).

For violations that involve fraud, deceit or manipulation and that directly or indirectly

result in or create the risk of substantial losses to others, the statutes authorize a "third-tier"

penalty in an amount up to the greater of $100,000 per violation or the defendant's gross

pecuniary gain as a result of the violation. *Id*. The exact amount of the penalty is for the court's

discretion.

Here, as set forth above, Renert and Hawthorne raised $22 million through the fraudulent

offering of unregistered securities, and they diverted at least $717,276 for their own benefit.  This

conduct – a systematic campaign to defraud investors and pocket the proceeds – was especially

egregious.   Accordingly, a third-tier penalty – the greater of $100,000 per violation or the gross

pecuniary gain – would be appropriate for both Renert and Hawthorne.

19

## CONCLUSION

For the reasons set forth above, the Court should enter a default judgment against Renert

and Hawthorne (i) permanently enjoining them from future securities law violations, (ii) ordering

them, jointly and severally, to pay disgorgement and pre-judgment interest in the total amount of

$820,823, and (iii) ordering each of them to pay an appropriate civil penalty.

Respectfully submitted,

JUAN MARCEL MARCELINO
DISTRICT ADMINISTRATOR

By:  _____
Frank C. Huntington (Fed. Bar No. CT-01850)
Senior Trial Counsel
LeeAnn G. Gaunt (Mass. Bar No. 630557)
Branch Chief
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 424-5900  ext. 201 (Huntington)
(617) 424-5940  fax

John B. Hughes (Fed. Bar No. CT-05289)
Assistant U.S. Attorney
Chief, Civil Division
U.S. Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT  06510
(203) 821-3700
(203) 773-5373  fax

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**

Dated:  October 29, 2003

20

## CERTIFICATE OF SERVICE

I, Frank C. Huntington, certify that on October 29, 2003, a copy of the foregoing Plaintiff's Memorandum in Support of its Motion for Entry of Default Judgment against Defendants Ian L. Renert and Hawthorne Sterling & Co. was sent by first-class mail to defendant Ian L. Renert at the address indicated on his notice of appearance dated May 23, 2003 and filed on July 30, 2003:

Ian L. Renert
14990 Horseshoe Trace
Wellington, FL  33414

_____
Frank C. Huntington

21