UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 3:01cv1027(PCD) |
| IAN L. RENERT, HAWTHORNE STERLING & CO. and DONNA L. WOOD, | ) |
| Defendants. | ) |

## DECLARATION OF FRANK C. HUNTINGTON, ESQ.

Frank C. Huntington, Esq. hereby declares, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1. I am an attorney and a member in good standing of the bar of the Commonwealth of Massachusetts. I am a Senior Trial Counsel in the Boston District Office of plaintiff Securities and Exchange Commission ("Commission"). I make this declaration based upon my personal knowledge and upon information and belief as set forth below and in support of the Commission's motion for entry of a default judgment against defendants Ian L. Renert and Hawthorne Sterling & Co. ("Hawthorne").

2. Based upon my oral and written communications with Howard A. Becker, Esq. and Lewis K. Wise, Esq., who previously represented Renert and Hawthorne in this action, it is my understanding that Renert is not an infant or an incompetent person and that Renert is not in the military service of the United States.

3.     I have been informed by several reliable sources that Renert has left the United States, is now living in South Africa, and is now raising funds for a new investment scheme.

4.     The Commission retained the accounting firm of Hoffman Alvary & Co. to reconstruct the financial condition of the funds controlled by Renert and Hawthorne using the bank and brokerage records obtained in discovery. A true and accurate copy of the expert report by Philip Green, a principal of Hoffman Alvary, is attached hereto as **Exhibit A**. Hoffman Alvary determined that, from the start of the fraud through June 30, 1999, Renert and Hawthorne received the sum of $717,276 from the funds. *See* Green Report, ¶36. That figure no doubt understates the true amount which Renert and Hawthorne obtained from the funds, but the incomplete state of the funds' books and records made it difficult for Hoffman Alvary to extend their analysis to the period after June 30, 1999.

5.     The Commission's standard practice is to seek pre-judgment interest on a defendant's disgorgement obligation calculated in the same manner that the Internal Revenue Service uses to calculate tax over-payments or under-payments. Applying that method, the pre-judgment interest on Renert and Hawthorne's joint disgorgement obligation of $717,276, calculated from the filing of the Complaint on June 6, 2001 through October 1, 2003, would be $103,547, for a total disgorgement obligation of $820,823. A table explaining this calculation is attached hereto as **Exhibit B**.

Executed under the pains and penalties of perjury this 29th day of October 2003 at Boston, Massachusetts.

_Frank C. Huntington_
Frank C. Huntington, Esq.

2

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE       )
COMMISSION                    )
                              )
        Plaintiff,            )
                              )
    vs.                       ) Case No. 301CV1027-PCD
                              )
IAN L. RENERT,                )
HAWTHORNE STERLING & CO. and  )
DONNA L. WOOD                 )
                              )
        Defendants.           )
                              )

UPDATED EXPERT REPORT OF PHILIP GREEN
PREPARED PURSUANT TO RULE 26(a)(2)

### I.     Preliminary Statement

1. I have been retained by the United States Securities and Exchange Commission ("SEC") to analyze the available financial records of the Hawthorne Sterling Family of Funds ("the Funds"). In connection with my work I also have prepared certain calculations regarding the Funds' performance from June 1, 1997 through June 30, 1999. If necessary, I may also respond to any reports regarding the accounting and returns earned by the Funds prepared on behalf of Mr. Ian Renert and Hawthorne Sterling & Co. ("Hawthorne Sterling") (Throughout this report Mr. Renert and Hawthorne Sterling may be collectively referred to as the "Defendants.")

2. Mr. Renert was the founder of Hawthorne Sterling & Co. ("Hawthorne") and Equivest Premier Holdings Ltd. ("Equivest"). Hawthorne and Equivest acted as investment advisors to the Funds. Ms. Donna Wood was responsible for the day-to-day administration of the Funds.[1] The Funds operated from approximately June 1997 through June 2000. In June 2000 a Bahamian court placed the Funds in receivership. The SEC filed this action in July 2001 after the Bahamian receivership was lifted. The SEC has asserted that the Defendants have violated the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Company Act of 1940 in connection with their sale of shares and operation of the Funds.[2]

3. Since issuing my initial report, I have received and reviewed additional documents related to this case. These documents include a portion of a general ledger maintained by Ms. Donna Wood dated June 29, 1999 and certain other accounting records. These documents were recently produced by the Bahamian government. I have therefore updated this report and its findings to reflect the additional information contained in these documents.

4. Exhibit A, as included in my earlier report, is a list of the documents that I have reviewed in connection with forming my opinions. These documents include, but are not limited to, bank and brokerage statements, private placement memoranda and correspondence related to the operation of the Funds. Should additional information become available to me that affect any of the conclusions or opinions herein, I may supplement or amend this report as necessary.

---

[1] I understand that Ms. Wood resigned from her position with the Funds in July of 1999. I also understand that she has settled with the SEC and is no longer a defendant in this action.
[2] In particular the SEC has alleged that Defendant's violated Sections 5 (a) and (c) of the Securities Act of 1933 by offering for sale and selling unregistered securities and engaging in fraud in the offer or sale of securities. The allegations related to the Securities Exchange Act of 1934 include assertions that Defendants violated Section 10(b) and 10b-5. Defendant's allegedly violated Section 7(d) of the Investment Adviser's Act of 1940 by acting as underwriters for sale of interests in unregistered foreign investment companies and Sections 206(1) and (2) by engaging in fraudulent or deceptive conduct.

## II. Qualifications and Compensation

5. I am a principal in the consulting firm of Hoffman Alvary & Company LLC. Prior to founding the firm in October of 1996, I was a senior manager in the Dispute Analysis and Corporate Recovery Services practice of Price Waterhouse LLP, an international accounting and consulting firm. In connection with my consulting work, I have been involved in a number of investigative accounting assignments. I obtained my undergraduate degree in history from Rutgers College and received a masters in business administration degree with a concentration in accounting from Rutgers Graduate School of Management. I am a Certified Public Accountant licensed by the state of New York. My resume and a list of publications and cases in which I have given testimony either in deposition or at trial over the past four years are attached as Exhibit B.

6. My firm, Hoffman Alvary & Company LLC, is being compensated at the rate of $300 per hour for my work on this engagement. My firm's compensation is not affected by the outcome of this matter.

## III. Background of the Hawthorne Sterling Family of Funds

A. Corporate Structure and Investment Objectives

7. The Funds began with a single fund, The Arcadia Mutual Fund, Inc. ("Arcadia"), a Bahamian corporation organized in May 1997. The original subscribers were Howard and Kitty Lawrence. The Lawrences assigned their shares in the company to the company. At the same time, Ms. Nancy Lake was appointed the director of the company and Mr. Ian Renert the sole officer.[3]

8. Arcadia's shares were held by the Tenesheles Trust. This trust was an "international asset protection trust" formed under Bahamian law. The trustee was Nancy Lake and Mr. Ian Renert was appointed as the "Trust Protector." The primary beneficiary of the Tenesheles Trust was Equivest. Mr. Ian Renert was the primary shareholder of Equivest.

9. At the time Arcadia was organized, Mr. Renert was a partner in Hawthorne Sterling. Promotional materials for Arcadia state that Hawthorne Sterling was a financial consultancy based in Wilton, Connecticut that "specializes in restricted securities transactions and the private market for bank debentures, standby letters of credit, bank guarantees and medium-term notes."[4] These materials also state that Mr. Renert was the author of the "only two authoritative books ever written about the private market for bank instruments, i.e. bank debentures, standby letters of credit, medium term notes and bank guarantees."[5] Hawthorne Sterling was the publisher of these books.

---

[3] See Memorandum of Association of Arcadia Mutual Fund Inc.
[4] See ZZ0005382
[5] ibid.

3

10. It appears that Arcadia was established as a successor to a "hedge fund" run by Hawthorne Sterling in 1996. Mr. Renert began offering subscriptions to the Arcadia Mutual Fund in 1997. Engagement agreements for Arcadia state that it was supposed to invest in corporate and bank issued debentures at the direction of Hawthorne Sterling. Interests in Arcadia were sold through offshore investor seminars, web sites and "sponsors" who sought investors and were paid a commission.[6]

11. Arcadia appears to have been operated as an investment partnership with Hawthorne Sterling directing its trading and operations. As compensation for its activities, Hawthorne Sterling was entitled to deduct 35% of the gross profits it earned on each individual trade.[7] Subscribers were to be provided with quarterly distributions based on Arcadia's profits. These distributions purportedly reflected the return earned by Hawthorne Sterling on each investor's capital. Principal withdrawals also were allowed every six months.

12. Arcadia initially invested in debentures of unlisted and small companies. These debentures had options that allowed them to be converted into common stock and sold. Arcadia was advised on these transactions primarily by Hyett Capital Corporation which was operated by Ethyl and Hyman Schwartz. Converted shares were held in a variety of brokerage accounts. Arcadia also attempted to invest in bank debentures. Account statements from October 1997 indicate that when the fund reached $10 million it would "invest in the more profitable bank debenture market."[8]

13. Beginning in 1998, a number of additional funds related to Arcadia were incorporated in the Bahamas. Exhibit C is a list of the funds that were incorporated after the Arcadia Mutual Fund.(I understand that these funds were collectively known as the "Hawthorne Sterling Family of Funds" or "the Funds") The shares of some, if not all, of these funds also were held by the Tenesheles Trust.

14. Certain of these funds were "private label funds." Private label funds included the Windmere, Sequoia, and Executive funds among others.[9] According to Ms. Wood, the private label funds had "sponsors," who brought investors to the funds. Although they had the same investments as the other funds, the "private label funds" did not pay Hawthorne Sterling 35% of the profits earned from each trade.[10]

15. Private placement memoranda are available for certain of the funds incorporated after Arcadia. These documents contain nearly identical information. For example, the private placement memorandum for the Camelot Fund states that Equivest had been appointed by the fund to act as the investment manager for the fund. Hawthorne Sterling was appointed by the investment manager to act as a "sub-advisor" to the

---

[6] Complaint, page 2 and pages 8 and 9.
[7] ZZ005369-70
[8] ZZ0003530
[9] See letter Renert to Thomas, August 1, 1999
[10] Deposition of Ms. Donna Wood pages 134 - 136

4

fund. The private placement memorandum also states that Mr. Ian L. Renert was the principal shareholder of Hawthorne Sterling & Company.[11] In addition, Wood & Associates was "selected to serve as the Fund's administrator, Registrar and Transfer agent."[12]

16. The available private placement memoranda for the funds incorporated after Arcadia state that these funds had different investment objectives. The objective of the Camelot Fund was to "provide conservation of capital, current income and long-term growth of capital and income by investing in stocks, bonds and other fixed income securities."[13] In contrast, the private placement memorandum for the Windsor Group, Ltd. states that the fund's investment objective was capital appreciation. The Windsor Group Ltd. was to invest in equity securities traded on the over-the-counter market as well as foreign currencies.[14] The Churchill Group Ltd. private placement memorandum indicates that the fund's investment objective was "to provide a high level of current income exempt from federal U.S. taxes. The Fund emphasizes undervalued but fundamentally sound investments in municipal obligations used to finance roads, schools, hospitals and other public needs."[15] Notwithstanding these differing investment objectives, Arcadia operated as the "umbrella for all funds under management."[16] Mr. Renert stated that in fact they had "been treating the group of Funds as if it were one single fund."[17]

17. In 1998 and 1999, the Funds also invested in internet and high technology industry publicly traded stocks and options. Mr. Renert and Mr. David Smith appear to have been responsible for this investing strategy. The Funds also invested in a market-timing strategy involving publicly traded mutual funds that was directed by Mr. Smith. This program attempted to profit from price differentials in publicly traded mutual funds from the time the markets closed in Europe until the close of trading on the New York Stock Exchange. This strategy appears to have been active beginning in mid-1999. Despite the stated objectives of the Funds, I am not aware of any significant investments in bonds, municipal obligations or foreign currencies.

B. Administration of the Funds

18. From 1997 through mid-July 1999, Ms. Donna Wood of Wood & Associates performed the back office operations for the Funds. According to the private placement memorandum for Churchill Group Ltd., Ms. Wood, a CPA, had previously worked as a tax accountant and auditor at Arthur Young & Company and the State of Alaska. She had apparently formed her own private company to assist clients with their funds management and equity research.

---

[11] ZZ0000869
[12] ZZ0000880.
[13] ZZ0000869
[14] ZZ0000905
[15] ZZ0001408
[16] Letter Wood to Ashurst, June 24, 1998
[17] Letter Renert to Thomas August 1, 1999.

19. The private placement memoranda indicate that Ms. Wood's responsibilities as administrator included:

- Issuing the Funds' shares;
- Keeping the register of shareholders;
- Calling and holding meetings of directors;
- Communicating with shareholders (including furnishing all shareholders with reports);
- Communicating with the general public and relevant Bahamian governmental entities;
- Accepting subscriptions from shareholders;
- Maintaining the principal corporate records and books of account;
- Making books and records available for audit and answering questions;
- Calculating and disbursing payments of income and gains to shareholders;
- Disbursing payments of legal fees, advisory fees, administrative fees and other fees and expenses of the fund;
- Computing and publishing the Funds' Net Asset Value; and
- Effecting redemptions of shares.

For providing these services, Wood & Associates was to receive $1,000 per week from each fund for which it provided administrative services.[18]

20. The offices of Wood & Associates initially were located in Tacoma, Washington. In mid-1998, the functions performed by Wood & Associates were moved an office in Mexico.[19] This office was in the home of Mr. Nigel Prescott, who was employed by Wood & Associates.[20] After operations in Mexico commenced, Ms. Wood worked three or four days per month preparing the Funds' general ledger and other financial reports.[21]

21. According to Ms. Wood, she received copies of the Funds' bank and brokerage statements at her office in Tacoma, Washington. These documents were then sent to the office in Mexico.[22] Ms. Wood stated that duplicate copies of certain bank and brokerage statements also were sent to the Funds' address in the Bahamas.[23] Ms. Wood stated that in early 1999 she sent the 1998 financial records for the Funds to the

---

[18] In her investigative testimony, Ms. Wood testified that her work for the Funds included: receiving investor funds and depositing them into bank accounts, communicating with Mr. Renert to send money to be invested, preparing of customer statements; and preparing the Funds' general ledger. See testimony of Ms. Donna Wood, p. 108.
[19] Testimony of Ms. Donna Wood, p. 83
[20] Testimony of Ms. Donna Wood, p. 114
[21] ibid, p. 108-109
[22] ibid, pages 33-34
[23] ibid, p. 19

Bahamas in connection with its annual audit.[24] It does not appear that this audit was ever completed.

22. Exhibit D is a list of the bank and brokerage accounts identified to date used by the Funds. Exhibit E is a chronology of the operations of the Funds from June 1997 through June 1999.

C. Financial Reports of the Funds

23. Ms. Wood prepared balance sheets and profit and loss statements for the Funds on a monthly basis. In her testimony, she indicated that she also prepared status reports of cash and investments for Mr. Renert on at least 10 occasions.[25] Audits by an independent accounting firm of the financial reports prepared by Ms. Wood were never completed.

24. The balance sheets and income statements prepared by Ms. Wood do not accurately report all of the Funds' financial activities. Further, there is evidence that Ms. Wood did not capture all of the Funds' transactions in her reports. For example, I am aware of a number of instances in which there were significant differences between amounts contained in the reports prepared by Ms. Wood and information supplied by Hyett Capital Corporation.

25. I have prepared balance sheets, income statements and investment subledgers identifying the Funds' investments by security for June 1997 through June 1999. Since most of the Funds' expenses were not predictable and regularly accrued, I have prepared these reports using the cash basis of accounting. This basis of accounting involves recognizing events in the financial reports when settled in the Fund's cash and brokerage account statements. This basis of accounting is different than U.S. GAAP and the accounting method required of mutual funds registered with the SEC under the 1940 Act. U.S. GAAP and the SEC require mutual funds to recognize transactions on a trade date rather than a settlement date basis and to accrue expenses. Because of the nature of the Funds' transactions and its records, the reported net income for the Funds using the cash basis of accounting is not materially different from the income that would be reported if the accrual basis of accounting had been used.

26. In preparing financial reports for the Funds, I have relied on copies of its bank and brokerage account statements and any available additional records of the Funds' activities (i.e. e-mails, copies of debenture agreements, letters, memos, etc.). These documents were sorted chronologically and journal entries prepared for all transactions given accounting recognition. Exhibits F, G and H present the Funds' quarterly income statements, balance sheets and investment subledgers from June 1997 through June 1999 based on the information currently available.

---

[24] ibid, p. 13
[25] Deposition of Ms. Donna Wood, pages 72-73

27. In preparing these reports I recorded the Funds' transactions using the following accounting rules:

- Where possible, interest due on the Funds' restricted stock investments has been accrued each month based on the stated rates in signed debenture agreements.
- Transactions have been recorded at settlement date rather than trade date.
- Restricted stock investments have been recorded and maintained at cost. All other publicly-traded investments generally have been marked-to-market each month and the related gains and losses recognized monthly.
- Management fees have been recognized only when evidenced as reductions to the Funds' cash and brokerage account statements.
- Checks written by the Funds and wires out of the Funds' accounts not otherwise identified have been assumed to reflect the return of investors' capital. These transactions have reduced the amount due to investors without recognition of any fees charged to customers for early withdrawal.
- Amounts deposited in the Funds' accounts from outside sources have generally been recorded as the receipt of investors' funds.
- Wires into the Funds' accounts from unknown destinations not recorded as investors' capital have been recorded as a liability on the Funds' balance sheet as of the date received.
- Wires out of the Funds' accounts to unknown destinations not recorded as a return of investors' capital have been recorded as an asset on the Funds' balance sheet at the date of the transaction in the bank statement or brokerage account.
- Sales commission and other trading and operating expenses have been recorded as expenses in the financial statements as of the date observed on bank and brokerage statements.

28. The conversion rates applicable to debentures/restricted stock investments have been taken from documents in the Funds' financial records and agreed to share counts deposited in brokerage accounts when possible. Conversion rates have been estimated based on the terms of the debenture/restricted stock agreements and other information available to corroborate these rates.

29. To confirm the completeness and accuracy of entries recorded, the cash balance in each period's balance sheet was agreed to the sum of the cash balances held according to bank and brokerage account statements. Where possible, the value of investments held by the Funds according to the balance sheet and investment subledger also were agreed to brokerage account statements on a monthly basis.

IV.     **Opinions and Related Support**

30. **Opinion 1: The Funds' sustained an annualized loss of 38.6% for the seven months of operations ended December 31, 1997. The Funds sustained a loss of 21.2% for the full year ended December 31, 1998. During the first six months of 1999, the Funds earned a return of 175.9%.**

31. Exhibit I summarizes the quarterly returns earned by the Funds from June 1997 though June 1999. The following formula is used to calculate the Funds' return:[26]

$$\text{Return} = \frac{\text{Assets}_t - \text{Assets}_{t-1} - \text{Net CF}_t}{\text{Assets}_{t-1} + (0.5 * \text{Net CF}_t)}$$

    Where:  $\text{Assets}_t$ = Assets at time $t$
            $\text{Assets}_{t-1}$ = Assets at time $t-1$
            $\text{CF}_t$ = Net cash flows from period $t-1$ to $t$

32. Using this formula, the impact of inflows and outflows to investors on the Funds' performance have been eliminated in the calculated return. These inflows and outflows are not at the discretion of the Fund Manager and the Fund Manager should neither benefit from nor be penalized for their effect on earnings.

33. Return calculations are not presented in terms of net asset value per share because shares were never issued to investors in the Funds. While attempts were made at after the Funds were operating to unitize the Funds, such efforts were not successful. The returns as calculated reflect the change in the Funds' net asset value as a result of its investing activities.

34. Exhibit I shows the Funds' quarterly, annualized and inception-to-date returns based on the financial reports I have prepared. This chart shows that in 1997, the Funds sustained an annualized loss for the seven months of its operations of 38.6%. In 1998, the Funds sustained a further loss for the year of approximately 21.2%. In the first half of 1999, the Funds earned a return of approximately 175.9% through June 30, 1999. With the exception of the first quarter of 1999, the Funds did not earn returns of greater than 12% in any quarter from June 1997 through June 1999. By the end of 1998, the Funds had sustained a loss of 50.3% since their inception. Because of its investment in Shopping.com, as of June 30, 1999 the Funds had earned a return of 27.9% since their inception.

---

[26] Source: Dietz Method of calculating time-weighted return. See www.andreasteiner.net/performanceanalysis/return

**35. Opinion 2: From July 1997 through June 1999 the Fund's paid Equivest $682,000 and Mr. Renert a total of $35,000. In addition, Hyett Capital Corporation was paid a total of $1.1 million for its services.**

36. Exhibit C summarizes the gains and losses as well as the operating expenses of the Funds'. The engagement letters and private placement memoranda indicate that Equivest Premier Holdings as investment advisor to the Funds' was to be paid 35% of the gains from individual trades. I am not aware of any provision that specified that specified any compensation for Mr. Renert. As shown on Exhibit C, Equivest Premier Holdings was paid a total of $682,276 by the Funds from June 1997 through July 1999. In addition, Mr. Renert was paid a total of $35,000 during this period directly by the Funds.

37. From June 1997 through June 1999 the Funds gained approximately $10 million in connection with its investments in private placement securities. This amount includes approximately $8.4 million in gains from the Funds' investment in Shopping.com. As shown on Exhibit J, Hyett Capital Corporation was paid approximately $1.1 million by the Funds for its services. These payments amount to over 10% of the gains earned by the Funds from trading in restricted securities.

**38. Opinion 3: From July 1997 through June 1999 the Funds lost at least $500,000 in connection with its attempts to invest in prime bank schemes.**

39. Mr. Renert attempted to invest in "bank debentures." These "debentures" were in reality, "prime bank" schemes. I understand that prime bank schemes purportedly seek large sums of money from investors to fund bank's margin trading and covert operations by government organizations. In return investors in prime bank schemes are paid higher than market rates of return. The existence of a legitimate "bank debenture" market has never been proven. Mr. Renert openly declared his interest in generating returns for the Funds by investing in this market.

40. The records of the Funds evidence what may have been Mr. Renert's attempts to invest in the prime bank market. The first attempt occurred in October 1997 when $500,000 was transferred from the Funds' First Union account to Temp Funds. This money was never returned to the Funds. Accordingly, I have recognized a loss on this transaction in the Fund's December 1997 profit and loss statement.

10

## V. Exhibits

40. I expect to use this report and its related exhibits, as well as the documents listed in Exhibit A in support of any testimony offered at trial. A final determination has not yet been made with respect to the specific testimony, documents and exhibits, if any, which will be used at trial. Should additional exhibits be prepared for use at trial, they will be provided at the appropriate time.

*[signature]* 4/17/03
Philip Green

11



# U.S. Securities and Exchange Commission
## Division of Enforcement
## Prejudgment Interest Report

### Ian Renert and Hawthorne Sterling & Co.

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| Violation Amount | | | | $717,276.00 |
| 07/01/2001-09/30/2001 | 7% | 1.75% | $12,552.33 | $729,828.33 |
| 10/01/2001-12/31/2001 | 7% | 1.75% | $12,772.00 | $742,600.33 |
| 01/01/2002-03/31/2002 | 6% | 1.5% | $11,139.00 | $753,739.33 |
| 04/01/2002-06/30/2002 | 6% | 1.5% | $11,306.09 | $765,045.42 |
| 07/01/2002-09/30/2002 | 6% | 1.5% | $11,475.68 | $776,521.10 |
| 10/01/2002-12/31/2002 | 6% | 1.5% | $11,647.82 | $788,168.92 |
| 01/01/2003-03/31/2003 | 5% | 1.25% | $9,852.11 | $798,021.03 |
| 04/01/2003-06/30/2003 | 5% | 1.25% | $9,975.26 | $807,996.29 |
| 07/01/2003-09/30/2003 | 5% | 1.25% | $10,099.95 | $818,096.24 |
| 10/01/2003-10/31/2003 | 4% | 0.33% | $2,726.99 | $820,823.23 |

**Prejudgment Violation Range**      **Quarter Interest Total**      **Prejudgment Total**
07/01/2001-10/31/2003      $103,547.23      $820,823.23